## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARIE A.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **Case No. 3:23-CV-1094-MAB[2]** |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Marie A. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY

Plaintiff protectively filed a Title II application for a period of disability and DIB on April 7, 2020 (Tr. 252-54, 255-61). Plaintiff also filed a Title XVI application for SSI on

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 9).

April 17, 2020 (Tr. 262-68). Plaintiff's applications alleged disability beginning on December 2, 2017, due to numerous impairments including bilateral shoulder problems, thyroid condition, celiacs disease, degenerative disc disease of cervical spine, numbness in hands, swollen hands and feet, and anxiety (Tr. 61).

Plaintiff's claim was initially denied in January 2021 and upon reconsideration in February 2022 (Tr. 60-96, 97-157, 166-77). Plaintiff requested a rehearing by an Administrative Law Judge (ALJ), which occurred on June 30, 2022 (Tr. 34-59, 178-79). Following the hearing, ALJ Matthew Bring issued an unfavorable decision dated August 3, 2022 (Tr. 1-23). Plaintiff's request for review was denied by the Appeal's Council and thus, the ALJ's decision became the final agency decision (Tr. 27-32). Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision (Doc. 1).

## APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in substantial gainful activity, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity (RFC). *Id.* at § 416.920(e).

At question four, the ALJ must determine whether the claimant retains the RFC to continue performing their former occupation. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no,

the analysis proceeds to the fifth and final question, which is whether the claimant can make an adjustment to perform any other work. *Id.* at § 416.920(a)(4)(v). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, then the claimant is disabled. *Id.*

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and directed to the points and factual allegations raised by Plaintiff. Specifically, because Plaintiff challenges the ALJ's conclusion regarding the use of her upper extremities, the Court's summary of the record focuses upon evidence pertaining to Plaintiff's upper extremities.

Plaintiff was born on April 25, 1977, and was 40 years old at her alleged disability onset date of December 2, 2017 (Tr. 16, 60). Plaintiff worked in telecommunications as an Information Technology Manager from 1997 until her alleged disability onset date (Tr. 39, 379-83).[4] While Plaintiff attempted to perform some part-time work after her alleged onset date, that employment was sporadic and did not result in earnings sufficient to be considered substantial gainful activity (Tr. 6-7, 40).

Prior to her alleged onset date of December 2, 2017, Plaintiff dealt with pain and several other symptoms on a less frequent basis (Tr. 41, 720). Office treatment records from Plaintiff's visits to Dr. Robert Rice from December 2016 to November 2017 document that Plaintiff was suffering from back pain, along with pain in her neck, shoulders, hip, right ankle, and joints (Tr. 464-87). Numerous other records also document Plaintiff's struggles with back, neck, shoulder, thigh, hip, and ankle pain both

---

[4] The ALJ describes Plaintiff's past employment as being "a chief computer programmer" in his decision (Tr. 16). However, the ALJ's citations to the record refer to her prior job title as an "Information Technology Manager (Tr. 379). Ultimately, in light of the ALJ's determination at step four (discussed below), any potential distinction between the two job titles is inconsequential to the Court's analysis.

before and after her alleged onset date (Tr. 720-24, 731, 1002-04, 1080, 1337-61, 1529-54). Likewise, numerous records provide evidence of the mental impairments that Plaintiff was allegedly facing both before and after her alleged onset date (Tr. 920, 954-57, 961, 996-1000, 1047-49, 1366-1442).

On September 5, 2019, Plaintiff visited Dr. Susan Reynolds and reported shoulder and neck pain, as well as suffering from swollen hands and feet that takes two hours to go away in the morning (Tr. 954-58). Similarly on January 8, 2020, Plaintiff complained to Dr. Reynolds that she was experiencing pain in her neck that radiated down her arms and back, as well as dealing with numbness and weakness in her arms and loss of sensation in her hands (Tr. 962-65). Plaintiff made similar complaints during a September 2020 evaluation with the Illinois Department of Human Services (Tr. 1047-49). For instance, Plaintiff complained that "[i]t is very depressing that I can't use my hands and fingers. I can't grip anything. It will fall out of my hands." (Tr. 1047).

Similarly, a November 2020 report from West Park Medical Clinic noted that Plaintiff reported that her hands may get numb and she has difficulty gripping things (Tr. 1087-94). That report also included the results of a physical examination and stated, "[t]he patient could oppose the thumb to each finger in both hands. Pinch strength, arm, leg and grip strength were 4+/5 throughout." (Tr. 1089). It was further noted that Plaintiff had moderate difficulty in her left hand (and mild difficulty in her right hand) when picking up a coin, picking up and holding a cup, picking up a pen, using buttons or zippers, and tying shoelaces (Tr. 1091).

A function report was submitted by Plaintiff's friend, Terry Hopkins, in 2020 (Tr. 386-93). Hopkins indicated that Plaintiff is in constant pain and has difficulties with mobility and completing simple tasks (Tr. 386). Hopkins stated that Plaintiff is able to prepare simple meals such as microwave meals on her own, but frequently requires assistance from others (Tr. 388). Hopkins also wrote that Plaintiff needs assistance doing housework, but is sometimes able to drive herself, shop on a limited basis and manage her own finances (Tr. 388-89). Hopkins further explained that Plaintiff is unable to participate in events or partake in activities like she used to (Tr. 390-91).

Plaintiff's counsel also prepared a function report in 2020 on Plaintiff's behalf (Tr. 398-408). In the report, Plaintiff indicated she is unable to shop without assistance, do housework and yard work, prepare meals, provide personal care to herself without assistance, and attend social functions (Tr. 399-402). Plaintiff stated that her ability to do certain things such as preparing meals or doing housework was impeded by her limited use of her hands (Tr. 400-01).[5]

No medical opinions were provided but several administrative medical findings were prepared. In January 2021, Dr. John Peterson, a state agency medical consultant, reviewed Plaintiff's medical records and made several findings. Dr. Peterson found Plaintiff had numerous exertional limitations and he limited her to occasional pushing and/or pulling in both upper extremities (Tr. 60-72). Dr. Peterson also limited Plaintiff's

---

[5] An essentially identical function report was prepared on March 23, 2021, by Plaintiff's counsel (Tr. 428-35). This report included some additional information regarding kidney problems Plaintiff experienced that resulted in hospitalization (Tr. 435).

left hand use to occasional handling and fingering, and her right hand use to frequent handling and occasional fingering (Tr. 73). Dr. Peterson concluded that Plaintiff was able to perform work at the sedentary exertional level with postural and environmental limitations (Tr. 71-75).

At the reconsideration level, Dr. Terra Jones, a state agency physician, reaffirmed Dr. Peterson's findings (Tr. 97-119). Dr. Jones also found Plaintiff could perform unskilled, sedentary work with appropriate limitations (Tr. 123-25). In January 2022, Dr. Colleen Ryan, a state agency physician, reviewed the record and findings of Dr. Peterson and Dr. Jones (Tr. 437-39). Dr. Ryan's findings were divided into two time periods, 12/2/17 to 4/30/20 (Tr. 1297-34) and 5/1/20 continuing onwards (Tr. 1305-13). Dr. Ryan imposed less restrictions during the earlier period, such as allowing unlimited pushing and pulling (Tr. 1298) and no manipulative limitations (Tr. 1300). To support this distinction, Dr. Ryan emphasized that certain severe physical impairments were not documented or diagnosed until after Plaintiff's alleged onset date of 12/2/17 (Tr. 437-39, 1305-13). However, when reviewing the time period from 5/1/20 until the present, Dr. Ryan agreed with the prior medical assessments and the limitations they imposed (Tr. 437-39, 1305-13).

Dr. Howard Tin, a state agency psychiatric consultant, conducted a mental RFC assessment at the initial level in January 2021 (Tr. 75-79). Dr. Tin concluded that, since the protective filing date, Plaintiff has severe mental impairments that requires limiting her to performing one and two-step tasks and avoiding interactions with the public (Tr. 78-79). Upon reconsideration, Dr. Maria Yapondjian-Alvarado, a state agency psychiatric

consultant, found Plaintiff was capable of performing simple, routine, and/or repetitive tasks (Tr. 119-22). Dr. Yapondjian-Alvarado stated that Plaintiff "would do best in a work setting with brief and superficial contact with the public." (Tr. 122).

An evidentiary hearing was held before ALJ Bring on June 30, 2022 (Tr. 33-59). During this hearing, Plaintiff testified that she previously worked in telecommunications doing coding, but lost her job around the time her employer was acquired by another company (Tr. 39). Plaintiff attempted to return to work after that date, but her health deteriorated around that time, potentially due to complications from a surgery and two car accidents (Tr. 39). Plaintiff discussed how she sought part time employment after that date but was unable to maintain a position because she couldn't stand on her feet for long periods of time and couldn't hold serving trays (Tr. 39-40). She said a combination of issues kept her from performing other jobs, and that the loss of feeling in her hands prohibited her from writing clearly and was a major factor in her inability to work (Tr. 40). Plaintiff explained how issues with her hands went from being a sporadic problem to something that she deals with constantly (Tr. 41). When the ALJ asked Plaintiff how much weight she estimated she could lift with her hands, Plaintiff said five pounds (Tr. 43). The ALJ then asked Plaintiff how she manages day to day activities (Tr. 44). Plaintiff said she cannot really cook but sometimes can make herself a sandwich and that she does laundry once a week if she can (Tr. 44). She also tries to avoid driving due to her medications, but she is at least somewhat able to manage her own finances (Tr. 44-45).

Charles Turner, a vocational expert, testified as to Plaintiff's ability to find employment based upon her limitations (Tr. 52-56). Mr. Turner first explained that based

upon her limitations, Plaintiff was unable to perform past work (Tr. 54). Thereafter, Mr. Turner testified that Plaintiff could perform several unskilled, sedentary jobs given her limitations,[6] including as a table worker (approx. 10,000 jobs nationally), document preparer (approx. 16,000 jobs nationally), and a surveillance system monitor (approx. 2,500 jobs nationally). Significantly, the ALJ then asked:

> ALJ:   Everything the same, but added that on the left upper extremity, handling and fingering would be limited to occasional. Is that going to then rule out unskilled sedentary jobs?
>
> Vocational Expert:   Well, the monitor job would remain and with the others, yes. I could not submit any other jobs at the occasional.

(Tr. 54). When Plaintiff's counsel questioned the vocational expert, he admitted that the number of surveillance system monitor jobs was "a very low number." (Tr. 55-56).

## THE ALJ'S DECISION

The ALJ followed the five-step analytical framework outlined above. At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since December 2, 2017, Plaintiff's alleged onset date (Tr. 6). At step two, the ALJ found Plaintiff has the severe impairments of cervical and lumbar degenerative disc disease, left shoulder acromioclavicular joint arthropathy, carpal tunnel syndrome (CTS),

---

[6] As described to the vocational expert, the ALJ stated the following limitations and factors:

> If you do assume a hypothetical person of the claim's same age, education and past work experience, assume further an individual able to do work at the sedentary exertional level I'll say frequent, rather than constant – doublecheck on thing here – frequent, rather than constant, handle, finger and feel bilaterally; no ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, crawl; no more than occasional exposure to hazards such as unprotected heights, moving mechanical parts; mentally able to perform simple and routine tasks; able to interact with the public and with coworkers on an occasional basis.

(Tr. 54-54).

fibromyalgia, anxiety disorder and adjustment disorder (Tr. 7). The ALJ also found Plaintiff has numerous medically determinable non-severe medical impairments including migraines, celiac disease, Hashimoto's thyroiditis, and seizure disorder (Tr. 7). At step three, the ALJ held that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 7-9). As it relates to the use of her upper extremities, the ALJ stated:

> The claimant does not meet listings 1.15, 1.16 or 1.18. There is no evidence indicating the claimant cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and the use of a medically necessary mobility device. Specifically, examinations showed some deficits in his grip strength and ability to manipulate objects but there was no documented need for an assistive device requiring the use of both hands (Exhibits 5F/1-25, 7F/23, 9F/1, 9F/45-55, 13F).

(Tr. 7).

Before turning to step four, the ALJ analyzed Plaintiff's RFC (Tr. 9-16). Specifically, the ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is able to frequently balance and occasionally climb ramps or stairs, stoop, kneel, crouch and crawl but never climb ladders, ropes or scaffolds. She is able to frequently reach, handle and finger with her bilateral upper extremities. She must avoid more than occasional exposure to hazards such as unprotected heights and moving mechanical parts. She is able to perform simple and routine tasks and interact with co-workers and the public on an occasional basis.

(Tr. 9). In reaching this conclusion, the ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 10).

Significantly, in evaluating Plaintiff's RFC, the ALJ repeatedly relied upon evidence supporting the conclusion that the claimant maintains good strength in her upper extremities (Tr. 13). Accordingly, the ALJ found the upper extremity manipulative limitations and pushing and pulling limitations to be inappropriate or excessive (Tr. 13-15).[7] In pertinent part, the ALJ held:

> Since the protective filing date, the opinion of Dr. Peterson is persuasive with regard to limiting the claimant to sedentary work with additional postural, manipulative and environmental limitations because it is generally supported by a review and summary of the evidence available at the time of the opinions; however, the undersigned finds pushing and pulling limitations are not appropriate because the claimant has good strength in her upper extremities. The undersigned also finds Dr. Peterson's left upper extremity manipulative limitations are excessive and there is no support for the limitations regarding exposure to temperature extremes, wetness, humidity, vibration, pulmonary irritants. The undersigned finds she is able to perform sedentary work with additional postural limitations. She is able to frequently reach, handle and finger with her bilateral upper extremities but she must avoid more than occasional exposure to hazards. This is consistent with the claimant's treatment notes that show diminished range of motion in her cervical spine and left shoulder, but she had good strength in her upper extremities. There was also tenderness in her lumbar spine and her range of motion was painful, but she ambulated with a normal gait. There was evidence of right CTS and cervical radiculopathy, but examinations showed no deficits in her grip strength or ability to manipulate objects with her hands (Exhibits 5F/1-26, 7F/12, 7F/23, 9F/1, 9F/45-55, 12F/1, 24F/6, 28F/32). Although a consultative examiner noted diminished sensation in her hands and she had difficulty picking up a coin/manipulating objects, her muscle and grip strength was only mildly diminished (Exhibit 13F).

---

[7] Notably, the ALJ found Dr. Peterson's "left upper extremity manipulative limitations" to be excessive (Tr. 13). However, Dr. Peterson also imposed an exertional limitation of occasional for fingering (fine manipulation) with Plaintiff's right hand (Tr. 73). While the ALJ later stated that he found Plaintiff could frequently reach, finger, and handle with both upper extremities, he failed to provide a specific explanation for why he was disregarding Dr. Peterson's exertional limitation for fingering with Plaintiff's right hand.

(Tr. 12-13). Additionally, the ALJ rejected the findings of Dr. Jones and Dr. Ryan regarding limitations on the use of Plaintiff's upper extremities and pushing/pulling for the exact same reasons (Tr. 13-14).

The ALJ also reviewed Dr. Tin's and Dr. Yapondjian-Alvarado's findings regarding Plaintiff's severe mental impairments (Tr. 14-16). Notably, the ALJ found most of their opinions to be persuasive but distinguished from them by finding that, since the protective filing date, Plaintiff is able to interact with co-workers and the public on an occasional basis (Tr. 14). The ALJ reached this conclusion because, among other reasons, Plaintiff presented herself as cooperative and pleasant to her medical care providers (Tr. 14-15). The ALJ's decision also stated that Plaintiff could perform simple and routine tasks (Tr. 15).

The ALJ found inconsistencies between Plaintiff's medically determinable impairments and some of her alleged symptoms. The ALJ explained:

> While her medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, the objective medical evidence does not reasonably substantiate her allegations about intensity, persistence and functionally limiting effects of the symptoms. The claimant testified she has neck and left shoulder pain that makes it difficult to lift more than five pounds, but she is able to do laundry.

(Tr. 15). The ALJ also reemphasized that Plaintiff had "good muscle and grip strength in her upper extremities." (Tr. 15).

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work as a chief computer programmer (Tr. 16). The ALJ then noted that Plaintiff was 40 years old at the alleged onset date, and subsequently changed age category to a

younger individual age 45 to 49 (Tr. 16). Finally, at step five, the ALJ concluded that in light of Plaintiff's age, education, work experience, and RFC,[8] "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. 16). Specifically, the ALJ relied upon the vocational expert's testimony that given Plaintiff's age, education, work experience, and RFC, she could be employed as a table worker (approx. 10,000 positions nationally), document preparer (approx. 16,000 positions nationally), and surveillance system monitor (approx. 2,500 positions nationally) (Tr. 17). Therefore, the ALJ concluded that a finding of "not disabled" was appropriate (Tr. 17).

## ISSUES RAISED BY PLAINTIFF

In her brief, Plaintiff raises the following issue:

1. The Administrative Law Judge failed to build a logical bridge from the evidence to his conclusions when considering the opinions from multiple state agency medical consultants.

## DISCUSSION

Plaintiff argues the ALJ erred by disregarding the opinions of the state agency medical consultants regarding exertional limitations upon the use of her upper extremities (Doc. 16, p. 7). Accordingly, Plaintiff avers that the ALJ failed to build a logical

---

[8] Again, the ALJ determined Plaintiff's RFC to be:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is able to frequently balance and occasionally climb ramps or stairs, stoop, kneel, crouch and crawl but never climb ladders, ropes or scaffolds. She is able to frequently reach, handle and finger with her bilateral upper extremities. She must avoid more than occasional exposure to hazards such as unprotected heights and moving mechanical parts. She is able to perform simple and routine tasks and interact with co-workers and the public on an occasional basis.

(Tr. 9).

bridge between the evidence and his conclusion related to the use of her upper extremities (*Id.*). Plaintiff contends that as a result of this error, the ALJ relied on jobs she could not perform in reaching his conclusion that a significant number of jobs exist in the national economy that Plaintiff is capable of performing (*Id.* at pp. 7-8).

In response, the Commissioner argues the ALJ reasonably considered the prior administrative medical findings in reaching his conclusion (Doc. 22, p. 4). The Commissioner further claims that the ALJ's decision to impose limitations different from those suggested by the state agency medical consultants was supported by evidence in the record (*Id.* at p. 5). The Commissioner concludes by emphasizing that even if reasonable minds could differ as to whether Plaintiff is disabled, the ALJ's decision must stand so long as it is supported by substantial evidence (*Id.* at p. 7-8).

The ALJ relied on the same exhibits and used the same language each time to explain why he decided to impose different limitations than those suggested by each of the three medical consultants. In pertinent part, the ALJ stated:

> The undersigned also finds Dr. Peterson's left upper extremity manipulative limitations are excessive and there is no support for the limitations regarding exposure to temperature extremes, wetness, humidity, vibration, pulmonary irritants. The undersigned finds she is able to perform sedentary work with additional postural limitations. She is able to frequently reach, handle and finger with her bilateral upper extremities but she must avoid more than occasional exposure to hazards. This is consistent with the claimant's treatment notes that show diminished range of motion in her cervical spine and left shoulder, but she had good strength in her upper extremities. There was also tenderness in her lumbar spine and her range of motion was painful, but she ambulated with a normal gait. There was evidence of right CTS and cervical radiculopathy, but examinations showed no deficits in her grip strength or ability to manipulate objects with her hands (Exhibits 5F/1-26, 7F/12, 7F/23, 9F/1, 9F/45-55, 12F/1, 24F/6, 28F/32). Although a consultative examiner noted

diminished sensation in her hands and she had difficulty picking up a coin/manipulating objects, her muscle and grip strength was only mildly diminished (Exhibit 13F).

Tr. 13-14.

In analyzing whether the ALJ relied upon substantial evidence to support his conclusion, the Court has extensively reviewed the exhibits cited by the ALJ to reach his conclusion. Exhibit 5F/1-26 contains office treatment records from 2/1/2019 to 9/26/2019 (Tr. 558-83). The majority of the cited records in Exhibit 5F discuss pain injection procedures (Tr. 558-81). The final two cited pages of 5F support the ALJ's conclusion that there was evidence of right carpal tunnel syndrome and cervical radiculopathy (a pinched nerve) (Tr. 582-83). Exhibit 5F does not, however, provide any support for the ALJ's conclusion regarding Plaintiff's strength in her upper extremities. Similarly, Exhibit 7F/12 is a new patient consult report from 12/22/2017 that documents Plaintiff's lower back pain but does not discuss her upper extremities (Tr. 720). Exhibit 7F/23 is a 7/7/2018 urgent care report that again documents Plaintiff's lower back pain but provides no meaningful discussion of Plaintiff's upper extremities (Tr. 731).[9]

Exhibit 9F/1 is Dr. Reynold's 10/16/2020 new patient report, and the only reference it includes to Plaintiff's extremities is that Plaintiff reported her "hands and feet

---

[9] The Commissioner points out that a later page in this urgent care report may support the argument that Plaintiff had strong grip strength (Doc. 22, p. 6; *see also* Tr. 734). While this page of the report does note "grip strong," the Court notes that the ALJ cited to a different page in this report when his pinpoint citations make it clear he was not simply referencing the first page of each report. *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) ("The government's lawyers who defend denials of disability benefits often rely heavily on evidence not (so far as appears) relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of harmless error."); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (reasons not apparent in the ALJ's opinion cannot be relied upon by the Commissioner on appeal).

swell when waking up in the morning-takes 2 hours for them to go down." (Tr. 954).[10] Exhibit 9F/45-55 contains additional medical records from Plaintiff's appointments with Dr. Reynolds that were conducted over the phone (Tr. 998-1008). The only potential reference to Plaintiff's upper extremities in these appointment records comes from a self-report by Plaintiff related to peripheral neuropathy, wherein it is stated that Plaintiff experiences tingling and weak limbs (Tr. 1007). Exhibit 12F/1 is a 10/6/2020 new patient report that discusses several of Plaintiff's issues but does not mention her upper extremities (Tr. 1080). Furthermore, Exhibit 24F/6 is a 12/9/2021 report which documents that Plaintiff was seen for trigger point injections (Tr. 1319). Similarly, Exhibit 28F/32 is the first page of a 2022 appointment report documenting more trigger point injections (Tr. 1478). Accordingly, none of the above-cited records provide support for the ALJ's conclusion that the limitations imposed upon the use of Plaintiff's left upper extremity were excessive.

Finally, the ALJ cites to portions of Exhibit 13F in support of his determination. Exhibit 13F is a West Park Medical Clinic Report from November 2020 (Tr. 1087-95). Regarding her upper extremities, this report first states "She had some mild difficulties picking up a penny off of the table with her right hand. She had moderate difficulties doing this with her left hand." (Tr. 1088). The following page notes that "[t]he patient

---

[10] The Commissioner again points out that a later page in Exhibit 9F included a physical examination and noted "normal movement of all extremities." (Doc. 22, p. 6; *see also* Tr. 956). The Court again finds it concerning that the ALJ chose to cite to a different page of this report to support his conclusion. *See Wiersma v. Astrue*, No. 10-C-240, 2010 WL 5095318, at *10 (E.D. Wis. Dec. 8, 2010) ("[I]t is the ALJ, not the Commissioner's lawyers, who must build an accurate and logical bridge from the evidence to the conclusion.").

could oppose the thumb to each finger in both hands. Pinch strength, arm, leg and grip strength were 4+/5 throughout." (Tr. 1089). The report continues by stating Plaintiff notes numbness to her hands and again reiterates the mild and moderate difficulties she had picking up a small object with her right and left hand, respectively (Tr. 1089). Thereafter, there is a table documenting fine and gross manipulative movements of Plaintiff's hands and fingers (Tr. 1091). The table recorded the mild difficulties Plaintiff had in using her right hand and the moderate difficulties in using her left hand when it came to picking up a coin, picking up and holding a cup, buttoning/unbuttoning, zipping/unzipping, and tying shoelaces (Tr. 1091). It also noted her grip strength was 4+/5 (Tr. 1091). With the exception of documenting Plaintiff's shoulder range of motion, the remainder of Exhibit 13F did not include any completed range of motion examinations regarding Plaintiff's upper extremities (Tr. 1092-95).

Ultimately, other than referencing Exhibit 13F, the ALJ failed to cite to any evidence that could have potentially supported his conclusion that the exertional limitations imposed upon Plaintiff's upper extremities by all three medical consultants were excessive (at least in regard to their opinions for the time period after 5/1/20).[11] This is particularly concerning because the ALJ appears to have cherry-picked favorable portions of Exhibit 13F related to grip strength and arm strength, while discrediting or ignoring portions of that same exhibit that demonstrated deficiencies in Plaintiff's use of

---

[11] Moreover, it is noteworthy that the ALJ cited to Exhibit 13F to acknowledge and refute that report's findings related to Plaintiff's diminished ability to use her hands, rather than to support his prior statement that Plaintiff has good strength in her upper extremities (Tr. 13-14).

her upper extremities (and her left upper extremity in particular). *See, e.g., Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Pamela T. v. Saul*, No. 18 CV 50173, 2020 WL 550604, at *4 (N.D. Ill. Feb. 4, 2020) (remanding because, among other reasons, the ALJ cherry-picked favorable statements from within a single document).

Here, the ALJ erred by rejecting the findings of all three medical consultants to substitute in his own determination that Plaintiff could use her upper extremities at an increased level.    In reaching his conclusion, the ALJ specifically stated that "examinations show no deficits in her grip strength or ability to manipulate objects with her hands." (Tr. 13). However, as discussed above, the records the ALJ cites to do not support this conclusion. In fact, although Exhibit 13F notes a 4+/5 in grip strength, it is hard to understand how a score of less than 5/5 could be considered as having "no deficit."[12] Furthermore, contrary to the ALJ's assertions, Exhibit 13F provides clear evidence that Plaintiff has mild and/or moderate difficulties in manipulating objects with her hands (Tr. 1091). Tellingly, the ALJ did not cite to any other report or study that contradicted this finding and he also failed to provide any reason why this portion of Exhibit 13F should be discredited while other portions of the same exhibit should be

---

[12] Conspicuously, the ALJ actually contradicted this statement earlier on in his decision, when he stated, "examinations showed *some deficits* in his grip strength and ability to manipulate objects but there was no documented need for an assistive device requiring the use of both hands." (Tr. 7) (emphasis added).

heavily relied upon. "The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

At most, the ALJ cited and relied upon some evidence for his conclusion that Plaintiff had good grip and arm strength (Tr. 1091). However, as discussed above, the ALJ did not provide sufficient evidence demonstrating good control and strength of Plaintiff's upper extremities as a whole, which was essential to his conclusion that the recommended limitations imposed upon the use of Plaintiff's upper extremities were excessive. The Court rejects the ALJ's attempt to equate good grip and arm strength with the ability to handle and finger frequently. *See Springer v. Saul*, No. 2:19-CV-197-JEM, 2020 WL 4932539, at *4 (N.D. Ind. Aug. 24, 2020) (while records cited to by the ALJ may have supported his conclusion that treatment offset some of the plaintiff's ailments, he failed to build a logical bridge as to how treatments alleviated issues in her hands specifically). Similarly, the Court also questions the ALJ's determination that pushing and pulling limitations were "not appropriate because the claimant has good strength in her upper extremities." (Tr. 13).[13]

"When an ALJ denies benefits, he must build an 'accurate and logical bridge from the evidence to [the] conclusion,' and he may not 'play doctor' by using his own lay

---

[13] Specifically, is it unclear whether the medical consultants' pushing and pulling limitations were imposed due to Plaintiff's decreased sensation in and ability to control her hands, and not due to a lack of general grip or arm strength. Conversely, the Court questions whether it is fair to assume that the pushing and pulling limitations were due to Plaintiff's upper extremity limitations at all. In fact, when considering Plaintiff's clear history of neck and back impairments, it seems just as conceivable that the pushing and pulling limitations were imposed due to those impairments.

opinions to fill evidentiary gaps in the record[.]" *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (quoting *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000)). Here, the ALJ filled in evidentiary gaps related to Plaintiff's ability to manipulate her upper extremities by relying upon his own opinion that good grip and arm strength evinces an ability to frequently handle and finger. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[A]n ALJ may not rely on a hunch."). Revealingly, the ALJ failed to cite to any evidentiary, statutory, or precedential support for such a contention and the Court doubts any such support exists. *See Stephen R. S. v. Comm'r of Soc. Sec.*, No. 3:20-CV-01160-GCS, 2022 WL 897188, at *7 (S.D. Ill. Mar. 28, 2022) ("Furthermore, even if the ALJ appropriately relied on Plaintiff's medical records to craft his RFC, he provides no explanation as to why the ability to play cards supports finding that Plaintiff can handle gross manipulation frequently with the left upper extremity, or why it supports finding that he could perform fingering that is fine manipulation of items no smaller than the size of a paperclip frequently.").

Additionally, the ALJ appears to rely upon Plaintiff's ability to sometimes do laundry as evidence that she can use her upper extremities and perform work at the sedentary level (Tr. 15). However, in discussing Plaintiff's ability to perform some household activities such as doing laundry, the ALJ failed to address the limitations Plaintiff stated she faced in performing such tasks. *See Latoria v. Astrue*, No. 12 C 1097, 2013 WL 438120, at *20 (N.D. Ill. Feb. 5, 2013) ("Thus, the ALJ cannot consider a claimant's household activities but ignore the limitations the claimant faces in performing them.") (internal citations and quotation marks omitted). Here, when discussing laundry,

Plaintiff stated she does it once a week, "if she can." (Tr. 44). As such, the Court believes it is inappropriate to take evidence that Plaintiff can *sometimes* do laundry as evidence that she can consistently perform work at the sedentary level. *See Stephen R. S.*, 2022 WL 897188 at *7.

Consequently, without relying upon sufficient evidence in support of his determinations, the Court finds the ALJ erred in determining that Plaintiff could frequently reach, handle and finger with her upper extremities. Significantly, this resulted in more than mere harmless error because the only position Plaintiff could perform with increased limitations on the use of her upper extremities was surveillance system monitor. According to the vocational expert, that position has approximately 2,500 jobs in the national economy (Tr. 54). Undoubtedly, this "very low number" (Tr. 56) falls well short of constituting a significant number of jobs in the national economy.[14] *See Richard J. N. v. Kijakazi*, No. 20 C 245, 2021 WL 6063912, at *12 (N.D. Ill. Dec. 22, 2021) (compiling a list of cases analyzing what is considered a significant number of jobs); *James A. v. Saul*, 471 F. Supp. 3d 856, 860 (N.D. Ind. 2020) ("The Court concludes that, as a matter of law, 14,500 jobs, or approximately 1 out of every 10,000 jobs, in the national economy is not a significant number of jobs.").

Furthermore, while the Court is convinced that remand is appropriate based upon the evidentiary shortcomings alone, the Court will touch briefly on its concerns regarding

---

[14] Notably, Plaintiff has not challenged the adequacy of the combined number of jobs available nationally as a table worker, document preparer, and surveillance system monitor. Consequently, the Court will not address the question of whether 28,500 positions nationally is a significant number of jobs.

the occupations of both table worker and document preparer. Significantly, a limitation the ALJ imposed was that Plaintiff was to avoid hazardous moving machinery (Tr. 9). Yet, as one court recently pointed out:

> For example, a table worker is defined as one who '[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles.' DOT 739.687-182 (Table Worker (fabrication, nec) alternate titles: spotter). Yet the ALJ provided the VE with the limitation of no hazardous moving machinery. [Dkt. 12-8 at 75.] The Court is unsure how this limitation could coexist with a job requiring direct contact with a moving conveyor.

*Jeanette P. v. Kijakazi*, No. 120CV03309MJDJMS, 2022 WL 557126, at *8 (S.D. Ind. Feb. 24, 2022). While the Court need not fully address this contention at this time, the Court notes this concern regarding the occupation of table worker and its relation to hazardous moving machinery, so that it can be considered upon on remand. *See Penny P. v. Kijakazi*, No. 21-CV-1055-SPM, 2022 WL 1289355, at *6 (S.D. Ill. Apr. 29, 2022) ("In sum, the ALJ's 'blind reliance on the vocational expert's testimony' does not constitute a reasoned analysis of plaintiff's disability application.").

Similarly, regarding the position of document preparer, the Court questions whether the position of document preparer is still a viable job or now obsolete in light of technological advances. *See Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) ("No doubt many of the jobs [listed in the Dictionary of Occupational Titles] have changed and some have disappeared."). In analyzing the position of document preparer, one court has explained:

> That concern is particular relevant in this case, where one of the jobs described by the VE, that of document preparer, microfilming, is described as follows:

Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify [microfilm camera operator] of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

DOT 249.587-018. The job of preparing documents for microfilm preservation is one that seems particularly likely to have changed in the last 37 years given the shift to digital storage and advances in scanning technology.

*Dearth v. Berryhill*, No. 2:16-CV-487-JEM, 2018 WL 1225045, at *4 (N.D. Ind. Mar. 9, 2018).

Similar concerns have been expressed by judges within this district. *See Penny P. v. Kijakazi*, No. 21-CV-1055-SPM, 2022 WL 1289355, at *5 (S.D. Ill. Apr. 29, 2022). Again, the

Court notes its concern with this occupation so that it may be adequately considered on

remand.

In conclusion, the Court holds that the ALJ's decision was not supported by

substantial evidence and the ALJ's discussion of that evidence was not sufficient to

provide a logical bridge between the evidence and his conclusions. *See Terry v. Astrue*,

580 F.3d 471, 475 (7th Cir. 2009). Accordingly, remand is proper so the ALJ can reconsider

the evidence and provide a logical bridge between that evidence and his conclusions.

The Court wishes to stress that this Memorandum and Order should not be

construed as an indication that the Court believes Plaintiff was disabled or that she should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

CONCLUSION

The Commissioner's final decision denying Plaintiff's applications for DIB and SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** February 29, 2024

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**